**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| DAPHNE LESLIE, | ) | |
|     **Plaintiff,** | ) | |
| v. | ) | **CIVIL ACTION 10-00309-KD-N** |
| | ) | |
| CUMULUS MEDIA, INC., *et al,* | ) | |
|     **Defendants.** | ) | |

## ORDER

This matter is before the Court on Plaintiff's motion for partial summary judgment (Docs. 39, 40, 41, 48), Defendants Cumulus Media, Inc. and Cumulus Broadcasting, LLC's Response (Doc. 49), and Plaintiff's Reply (Doc. 58); Defendants Cumulus Media, Inc. and Cumulus Broadcasting, LLC's' motion for summary judgment (Docs. 43, 44, 45), Plaintiff's Response (Docs. 50, 51, 52, 53, 55, 62) and Defendants Cumulus Media, Inc. and Cumulus Broadcasting, LLC's Reply (Doc. 59, 62); Plaintiff's motion to strike (Doc. 54) and Defendants Cumulus Media, Inc. and Cumulus Broadcasting, LLC's Response (Doc. 64); and Defendants Cumulus Media, Inc. and Cumulus Broadcasting, LLC's Motion to Strike (Doc. 60) and Plaintiff's Response (Doc. 65).

## I.    <u>Factual Background[1]</u>

On June 17, 2010, Plaintiff Daphne Leslie ("Leslie") initiated this action against Defendants for legal and equitable relief to redress unlawful discrimination and harassment on the basis of sex, disability and retaliation. (Doc. 1). Specifically, Leslie asserts claims against the Cumulus Defendants for sexual harassment/hostile work environment in violation of *Title VII of the Civil Rights Act of 1964,* 42 U.S.C. §

---

[1] In resolving this motion, the Court construes the evidence and the factual allegations in a light most favorable to the plaintiff. <u>Burton v. City of Belle Glade</u>, 178 F.3d 1175, 1187 (11th Cir. 1999) (providing that when ruling on a motion for summary judgment, the court "should view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion[]").

2000e *et seq*. (Count I),[2] retaliation in violation of the *Family and Medical Leave Act*, 29 U.S.C. § 2601 *et seq*. (Count II), and wrongful termination in violation of the *Americans With Disabilities Act,* 42 U.S.C. § 12101 *et seq.* (Count III); and state law claims against individual defendant Johnnie Coleman for invasion of privacy (Count IV) and intentional infliction of emotional distress (Count V), and against the Cumulus defendants for negligent hiring, training and supervision (Count VI). (Id.)

## A.    **Cumulus & Coleman**

Cumulus Broadcasting, LLC ("Cumulus") is a radio broadcasting company which owns and operates radio stations in midsized markets throughout the United States, including in Mobile, Alabama ("the Mobile market"). (Doc. 43-1 (Dep. Pizzati (Senior VP) at 7, 32)).[3]  During Leslie's employment, Gary Pizzati was the Senior Vice President of Cumulus, Monte Saunders was the Office/Business Manger, and Mark McMillen was the Market Manager.[4]  (Id. (Dep. Pizzati at 7, 29, 32-33); Doc. 43-2 (Dep. Leslie at 29-30, 103-104); Doc. 43-12 (Aff. McMillen at ¶1); Doc. 53-4 (Dep. Saunders at 20-21)).

Defendant Johnnie Coleman ("Coleman"), hired in 1999 and rehired in 2007 after a few years' absence, was employed by Cumulus in the Sales Department as a Cumulus Account Executive. (Doc. 43-10 (Dep. Coleman at 22-23); Doc. 43-1 (Dep. Pizzati at 68-69)). Coleman voluntarily resigned on March 2, 2009, after Cumulus' Senior Vice President and General Counsel Richard Denning ("Denning") investigated a January 12, 2009 e-mail text message (with attached photograph of his penis) that he sent

---

[2] While the parties brief Title VII retaliation on summary judgment, Leslie did not specifically allege a separate retaliation count and moreover, did not allege retaliation within the Title VII count of her Complaint. (Doc. 1 at 6-7). In Pleming v. Universal-Rundle Corp., 142 F.3d 1354, 1357 (11th Cir. 1998), the Court held that the "parties frame the scope of the litigation at the time the complaint is filed." In an effort to do so the court must rely on the claims asserted in Leslie's original Complaint. See e.g., Smith v. Books-A-Million, 398 Fed. Appx. 437 (11th Cir. 2010) (Claims not included in the complaint were not required to be considered by the District Court).

[3] Cumulus Broadcasting, LLC is a wholly owned subsidiary of Cumulus Media, Inc., and is the operating company. (Doc. 43-3 (Dep. Denning at 12-13)). Leslie was an employee of Cumulus Broadcasting. (Id.)

[4] McMillen was terminated 6/29/09. (Doc. 43-1 (Dep. Pizzati at 102-104); Doc. 43-12 (Aff. McMillen at ¶1)).

to co-worker Daphne Leslie's cellular phone. (Doc. 43-3 (Dep. Denning at 104-105, 129-131, 164-167); Doc. 43-10 (Dep. Coleman at 58, 70); Doc. 43-11 (Notice of Employee Separation-"resigned after being questioned regarding his inappropriate behavior"); Doc. 49-9 (Aff. Denning at ¶¶1, 4)).

**B.**     <u>**Leslie's Employment**</u>

On September 23, 2002, Daphne Leslie ("Leslie") began at-will employment with Cumulus as an Account Executive in the Sales Department. (Doc. 43-2 (Dep. Leslie at 21, 26-27); Doc. 43-2 at 51-53). Leslie's immediate supervisor was Mark McMillen ("McMillen"), and Leslie also worked under the direction and supervision of Cumulus Senior Vice President Gary Pizzati ("Pizzati"). (Doc. 43-2 (Dep. Leslie at 26, 96-97, 101-102); Doc. 43-1 (Dep. Pizzati at 7, 28)). Leslie's job responsibilities included developing new business, handling outside sales calls, attracting/closing advertisers to sell products and services, presenting marketing/advertising ideas to area businesses, selling commercial advertising time, attaining budgeted revenue goals, and subscribing to daily, weekly and monthly accountability requirements of the sales system. (Doc. 43-2 (Dep. Leslie at 47-48)). Regular work attendance was expected and was important for Leslie's job. (<u>Id</u>. (Dep. Leslie at 97)). Cumulus was flexible with its absentee policy, and employees such as Leslie could call in to the Sales Manager or Monte Saunders and self-designate available leave as sick or vacation days. (<u>Id</u>. (Dep. Leslie at 97-99)).

Leslie was a good employee and "a good seller" and prior to 2009 was rarely absent. (Doc. 43-1 (Dep. Pizzati at 7, 28; Doc. 43-2 (Dep. Leslie at 101-102)). However, in 2008 Leslie experienced a 25% decline in sales for the year. (Doc. 43-1 (Dep. Pizzati at 54)). According to Pizzati, this would require some management action as it is a performance based business: "there'd be a conversation first. And if the pattern or performance continued, then we could go and sit down and formulate a document and put that employee on notice." (<u>Id</u>. (Dep. Pizzati at 54-57)). In December 2008, McMillen counseled the entire sales staff on all of their collective performance. (<u>Id</u>. (Dep. Pizzati at 58)). While there was no blanket policy for performance standards that would require discipline if an employee dropped below a certain level, the company had fired sales or market managers if they did not perform up to standards,

after first counseling them and giving them written discipline. (Id. (Dep. Pizzati at 66-67)).

Subsequently on March 23, 2009, Cumulus issued Leslie a work performance memorandum noting "several serious deficiencies that need to be addressed in order for you to be a successful account executive". Cumulus refers to the memo as "an action step probably because her performance wasn't where it needed to be." (Doc. 43-1 (Dep. Pizzati at 93, 96); Doc. 43-2 at 159-164; Doc. 43-12 (Aff. McMillen at 2-3); Doc. 43-17 (e-mails); Doc. 51-8 (3/23/09 Memo)).[5] According to Cumulus, Leslie's "performance was off by 23,000 or 24,000 dollars." (Doc. 43-1 (Dep. Pizzati at 93, 96)). Other employees received similar work performance memos at that time. (Id. (Dep. Pizzati at 94-96); Doc. 51-10; Doc. 51-11). The memo included the words "disciplinary action including possible termination[]" which according to Leslie, threatened disciplinary action. (Doc. 43-2 (Dep. Leslie at 193-195, 218-219)). However, Leslie was never demoted or docked in pay and other than the memo, was never reprimanded or disciplined. (Id. (Dep. Leslie at 28-29, 90-92).

Additionally in 2009, for reasons unknown to Cumulus, Leslie was absent from work on various days in February, March and early April, and was consecutively absent from April 21-May 19, 2009 and June 1-August 20, 2009; she first used FMLA leave on May 4, 2009. (Doc. 43-7 at 7-12;[6] Doc. 43-2 (Dep. Leslie at 13-14, 122-123, 125-126, 129, 144, 147-148, 153-154, 156); Doc. 43-7 (Dep. Saunders at 90-93, 101, 112)).[7] According to Leslie, she was under a doctor's care in April and May 2009. (Doc. 52-1 (Decltn. Leslie at ¶10)).

---

[5] Leslie refused to sign the Memo. (Doc. 51-8 at 2).

[6] Doc. 43-7 at 7-12 consists of the Employee Attendance Report for the year 2009. (Doc. 43-7 (Dep. Saunders at 90-93, 101, 112)). The last notation of FMLA leave is June 3, 2009; however, as noted by Cumulus' Business Manager Saunders, he stopped recording the medical leave on the record based on the indication from Leslie's doctor that she could not return to work in June. (Id. (Dep. Saunders at 107)).

[7] In 2005, Leslie took eight weeks of FMLA leave; she had no problems at Cumulus after returning to work. (Doc. 43-2 (Dep. Leslie at 94, 96)).

Specifically, on April 3, 2009, McMillen e-mailed Pizzati and Denning about Leslie's sick days and her use of same since January 1, 2009, noting that her taking of time off was recurring and when she was going to be absent "we usually find out at the moment." (Doc. 43-2 at 169). On April 22, 2009, Leslie's treating physician Dr. Blanchard submitted a note to Cumulus stating that she would be out of work for two (2) weeks due to medical problems. According to Leslie, when she returned to work McMillen requested that she have her physician fill out FMLA paperwork for that time off even though she thought it had been designated as vacation time.[8] (Doc. 43-2 (Dep. Leslie at 125-127); Doc. 43-2 at 96). Leslie returned to work May 20-29, 2009. (Doc. 43-2 (Dep. Leslie at 126)).

According to Saunders (and Cumulus) Leslie was out on FMLA leave as of May 4, 2009. (Doc. 53-4 (Dep. Saunders at 93)). Specifically, on May 13 and 14, 2009, McMillen e-mailed Leslie (noting that he had previously e-mailed her and called her on her cell phone) requesting that she update him on when she expected to return to work (stating that he had heard from Hazel Dyess at Cumulus that she would be sending in a doctor's note covering her absences for the week). (Doc. 43-2 (Dep. Leslie at 200-201); Doc. 43-2 at 168). On May 14, 2009, Leslie requested, via e-mail, FMLA documents from Hazel Dyess at Cumulus (per Saunders' discussion with her), and on May 15, 2009, Dyess faxed the FMLA paperwork to Leslie. (Doc. 59-7 at 1-5). Also on May 15, 2009, McMillen sent a letter memo with FMLA paperwork to Leslie, notifying her of her FMLA rights so that she could use FMLA leave if she qualified and noting that her FMLA leave would start on May 4, 2009.[9] (Doc. 43-2 (Dep. Leslie at 128-129); Doc. 43-2 at 98 (5/5/19 FMLA Memo); Doc. 43-3 (Dep. Denning at 168-169)). Leslie submitted

---

[8] Leslie alleges that Saunders told her that she had sick leave and vacation leave available for the April and May 2009 absences. (Doc. 52-1 (Decltn. Leslie at ¶10 at 3).

[9] By May 4, 2009, Leslie had already used her entire annual allotment of sick leave and vacation leave, even though she had not yet earned all of it (Cumulus allowed her to use all of the leave she would have earned if she actually worked for a full year). (Doc. 53-4 (Dep. Saunders at 93)); Doc. 43-2 (Dep. Leslie at 138-139)). At that point Leslie had no leave available. Cumulus notified Leslie of her FMLA leave rights so that she could take advantage of that leave. (Doc. 43-3 (Dep. Denning at 168-169); Doc. 43-2 at 70- 76 (FMLA Leave Policy)).

this information to her physician. Leslie provided Cumulus with a doctor's excuse which indicated she would return to work on May 20, 2009. (Doc. 43-2 (Dep. Leslie at 201)). Leslie's physician Dr. Blanchard completed the relevant paperwork on May 20, 2009 and returned same noting that Leslie's condition commenced April 8, 2009, she had "stress related issues" and was unable to perform any of her job functions – "unable to drive, may be difficult to interact with people" and that the dates of Leslie's incapacity "will vary[.]" (Doc. 43-2 (Dep. Leslie at 129-131); Doc. 43-2 at 101-104). On May 20, 2009, Cumulus Business Manager Saunders e-mailed Leslie notifying her that her FMLA leave commenced on May 4, 2009 (in response to McMillen's 5/15/09 memorandum about her FMLA leave). (Doc. 43-2 at 97). Leslie does not recall receiving that e-mail. (Doc. 43-2 (Dep. Leslie at 127)).

Leslie's request for FMLA leave was "approved" by Cumulus on May 15, 2009 (Doc. 51-12 at 2-3), and it was noted that she would be required to present a fitness for duty certificate to be restored to employment. (Doc. 43-2 at 99). Before May 15, 2009, Leslie had not told anyone at Cumulus the medical condition for which she needed FMLA leave; Cumulus only learned of her condition when she submitted her FMLA leave paperwork. (Doc. 43-2 (Dep. Leslie at 122-123, 129)). According to her May 2009 paperwork, Cumulus was notified of an "estimated" September 2009 return to work date. (Id. (Dep. Leslie at 124)). Leslie did not return to work after May 29, 2009.[10] (Id. (Dep. Leslie at 156, 213)).

On June 1, 2009, Leslie notified Cumulus that she would be absent that day; Saunders asked McMillen to follow-up with Leslie to ascertain the reason why and Leslie told them through a memo to Laura Bouhan cc'd to Denning, that she was still having some problems in the Mobile market. (Doc. 43-

---

[10] Leslie asserts that Cumulus does not dispute that she had a disability (Doc. 50 at 25). However, as noted in the Defendants' motion for summary judgment: "[i]f anything, Cumulus merely 'regarded' Plaintiff as out of leave on May 4, 2009; Plaintiff was not communicating about the reasons(s) for her absences." (Doc. 44 at 26 at note 44). Moreover, the record reveals that while Leslie claims she was disabled, she did not communicate a "disability" to Cumulus. Rather, Leslie described her illness as "confidential medical information" and when asked by the Market Manager McMillen about her illness, she preferred "not to say." (Doc. 51-3 at 3 (2/16/09 Letter)).

2 (Dep. Leslie at 132-133); Doc. 43-2 at 170; Doc. 43-20 at 2). Cumulus contacted Leslie in response and discussed her concerns via telephone. (Doc. 43-20 at 2; Doc. 43-2 at 166-167).

On June 2, 2009, Denning notified Leslie of the need for her to provide a doctor's note. (Doc. 43-2 at 171-172). "[Y]ou have not accrued any more vacation nor do you have any sick time to apply, so it is critical that this leave be supported under FMLA....If you don't have accrued time to take, and FMLA is not available, you must come to work." (Id.) Leslie responded the following day only to say that she would "submit the needed documents." (Doc. 43-2 at 173).

On June 3, 2009, Leslie's attorney submitted a request to Cumulus, on behalf of Leslie, for "immediate" FMLA leave due to "severe mental anguish" due to "outrageous sexual harassment, discrimination and retaliation". (Doc. 43-2 at 107). Leslie's attorney stated that "Leslie will provide medical documentation supporting her request for leave as soon as possible." (Id.) See also Doc. 43-2 (Dep. Leslie at 140)). Leslie had not previously notified Cumulus that she was suffering from severe mental anguish. (Doc. 43-2 (Dep. Leslie at 141)).

On July 20, 2009, a Certificate of Health Care Provider for Employee's Serious Health Condition under the FMLA was executed by psychiatrist Dr. Wilkerson concerning Leslie's medical status for "major depression, recurrent[,]" which Cumulus received on July 27, 2009. (Doc. 43-2 at 108-111). Dr. Wilkerson's certification noted as follows: the probable duration of Leslie's condition as "undetermined;" she was unable to sleep, has difficulty interacting with people and no energy; she was unable to perform any of her job functions due to the condition; the job functions she is unable to perform include interacting with people; she will be incapacitated for a single continuous period of time due to her medical condition estimating until September 2009"; she will need to attend follow-up treatment appointments or work part-time or on a reduced schedule because of her medical condition; the treatments or the reduced number of hours of work are medically necessary; the condition will possibly cause episodic flare-ups periodically preventing her from performing her job functions and it is medically

necessary for her to be absent from work during the flare-ups ("severe depression incapacitates this patient"). (Id.) See also Doc. 43-2 (Dep. Leslie at 141-145)).

On July 23, 2009, psychiatrist Dr. Wilkerson stated in an Attending Physician's Statement provided to Leslie's short-term disability provider (not Cumulus), that her diagnosis was major depression, she had poor sleep, depressed energy, lack of interest in activities, anxiety, weeping and poor concentration; it was "undetermined" as to when she could return to work; and marked "no" in response to whether her job could be modified to handle same with her impairment. (Doc. 43-2 at 177-178). See also (Doc. 43-2 (Dep. Leslie at 155-156)).

On July 30, 2009, defense counsel wrote Leslie's attorney (and Leslie) concerning the expiration of her FMLA benefits on July 24, 2009[11] and asking when she will be capable of returning to work, as "[t]he most recent medical report provided…suggest that she currently is unable to return to work – and will be so restricted for an indeterminant [sic] and unknown amount of time." (Doc. 43-2 at 112-121). At that time, Cumulus was "more than happy to reinstate" Leslie but noted that the medical report "expressly states…Leslie has difficulty interacting with people, has no energy, suffers from recurrent bouts of major depression, experiences daily spells of weeping, her depression 'incapacitates her[]'" and that she is "unable to perform any of her job functions" due to her condition. (Id. at 112). Cumulus requested that Leslie provide written confirmation from her doctor that she was fit to return to work and to perform her essential job duties, and included a detailed list of her essential job duties for reference. (Id. at 112, 116). Cumulus also requested, that if required, for her medical provider to suggest any accommodations thought necessary to enable Leslie to perform the essential functions of her job. (Id. at 112-113). See also Doc. 43-2 at 77 (Sales Responsibilities)). Leslie received and read the July 30th letter, but did not respond and

---

[11]  According to Cumulus, Cumulus initially incorrectly calculated when Leslie's FMLA leave expired; the correct FMLA leave expiration date should be August 7, 2009. (Doc. 43-3 (Dep. Denning at 169-175, 178-184). However, "it's not an error with regard to as of August 20 all her FMLA was used. It ended August 7. So as of the 20th, whether it was July 24 or August 7, all of her FMLA leave had been used." (Doc. 43-3 (Dep. Denning at 173)).

did not provide Cumulus with a fitness for duty certificate stating she was ready to return to work. (Doc. 43-2 (Dep. Leslie at 147-148, 150)).

Leslie applied for short-term disability benefits (as also referenced in the July 30th letter) which she received. (Id. (Dep. Leslie at 148-153); Doc. 43-2 at 122-127)). In the disability paperwork, Leslie stated she had been disabled since June 1, 2009 ("my FMLA time") and that she had suffered symptoms before June 1st. (Doc. 43-2 (Dep. Leslie at 152-253)).

On August 4, 2009, Dr. Wilkerson completed a Work Requirements form for the State of Alabama Department of Human Resources Food Stamp Program. (Doc. 43-2 at 178). Dr. Wilkerson stated that Leslie was not mentally and physically able to work based on her medical condition of "major depression, poor concentration, depressed mood, poor sleep, no energy[]" which commenced in February 2009, adding that the duration of her condition was "undetermined" and her ability to return to work was "undetermined." (Id.)

On August 20, 2009, Cumulus' counsel wrote a letter to Leslie's attorney (which she received and read), stating that no information had been received regarding her ability or intentions to return to work, the proposed timeline for a return to work, or the feasibility of a medical release for her return to work, such that "her leave continues to be of an indeterminant [sic] and unknown nature." (Doc. 43-2 at 128-129). Cumulus noted that it had continued Leslie's employment and the provision of health benefits beyond the expiration of her FMLA leave but that "[a] this point, we have no choice but to consider Ms. Leslie's job abandoned. Her last day with the company, therefore, will be deemed August 20, 2009." (Id. at 128). See also Doc. 43-2 (Dep. Leslie at 153-155); Doc. 43-3 (Dep. Denning at 167). As of August 20, 2009, Leslie had not provided Cumulus with a specific date to return to work or a medical release stating that she could return to work. (Doc. 43-2 (Dep. Leslie at 154)). Leslie did not respond to the letter. (Doc. 43-3 (Dep. Denning at 167, 169-170, 173)).

According to Leslie, she did not use all of her FMLA leave before she was terminated. (Doc. 43-2 (Dep. Leslie at 117); (Doc. 52-1 (Decltn. Leslie at ¶11)). Nevertheless, Leslie admits that as of the

August 20, 2009 date that Cumulus deemed that she had abandoned her job, she had not been released to return to work from her treating physician(s), and the only specific date when she was going to be released was the estimated date of September 2009.  (Doc. 43-2 (Dep. Leslie at 144-145)).

On September 21, 2009, Leslie's treating psychiatrist Dr. Wilkerson sent a letter to Leslie's short-term disability provider stating "[i]n my professional opinion she is not able to return to work at this point and requires further psychiatric care."  (Doc. 43-2 at 130; Doc. 43-2 (Dep. Leslie at 157)).  Dr. Wilkerson had previously estimated her return to work date as "September 2009."  (Doc. 43-2 (Dep. Leslie at 157)).  Dr. Wilkerson did not release Leslie to return to work within September 2009.  (Id.)  Leslie never provided a fitness for duty certificate to Cumulus.  (Id. (Dep. Leslie at 147-148, 213)).

On November 20, 2009, the State of Alabama Department of Industrial Relations Unemployment Compensation Agency mailed to Leslie a Notice of Determination disqualifying her or determining her ineligible for benefits because she obtained a leave of absence from Cumulus but failed to return to work.  (Doc. 52-2).  Leslie appealed that determination and on July 2, 2010, the decision was reversed and she was deemed eligible for benefits.  (Doc. 52-3).

C.      **Cumulus' Sexual Harassment, Discrimination & Retaliation Policies**

According to the Cumulus defendants, they are an Equal Opportunity employer committed to prohibiting unlawful harassment, discrimination and/or retaliation. (Doc. 43-2 at 59-61, 64; Doc. 43-3 (Dep. Denning at 103); Doc. 51-6 (Policy)).  The Cumulus Policy Prohibiting Unlawful Discrimination, Harassment and Retaliation, provides as follows:

> Cumulus is committed to maintaining a workplace free of unlawful discrimination and harassment based on gender…and any other factors prohibited by law…The purpose of this policy is not to regulate employees' personal morality.  Rather, it is to assure a professional workplace, free of unlawful discrimination and harassment….
>
> Cumulus does not tolerate violation of this policy. Cumulus will investigate all allegations of discrimination and harassment in as prompt and confidential a manner as possible and will take appropriate corrective action when warranted. Any person who is determined by Cumulus to have engaged in discrimination or harassment in violation of this policy may be subject to appropriate disciplinary action, up to and including termination of employment. Further, retaliation in any form against an employee or

10

applicant who complains of discrimination or harassment is strictly prohibited, and may itself be cause for appropriate disciplinary action.

* * *

This policy specifically covers sexual harassment as prohibited behavior. Sexual harassment is generally defined as unwelcome sexual advances, requests for sexual favors, and/or other verbal, visual or physical conduct of a sexual nature. Sexual harassment takes place when any of these occur:

- Submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment.
- Submission to or rejection of such conduct by an individual is used as a basis for employment decisions affecting such an individual.
- Such conduct has the purpose or effect or unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment.

Accordingly…[a]n intimidating, hostile, or offensive working environment may be created by such circumstances as pressure for sexual activities, unwanted and unnecessary physical contact with another employee, verbal abuse of a sexual nature, the inappropriate use of sexually explicit or offensive language, or the display in the workplace of sexually suggestive objects or pictures.

* * *

It is impossible to define every action or all words that could be reasonably interpreted as harassment…Determination of whether a situation qualifies as harassment depends on the circumstances, but generally speaking sexual harassment involves behavior that is uninvited, unwelcome and repeated.

A hostile or offensive working environment may also be created by the use of epithets, slurs or derogatory terms based upon an employee's …gender…

(Doc. 51-6 at 1-2). Cumulus' complaint procedure provides alternative avenues of complaint, allowing Leslie to go over the heads of local management to take a complaint all the way to the top, directly to the corporate headquarters in Atlanta, Georgia:

Complaints regarding violation of this policy should be made to the employee's immediate supervisor. If the employee is uncomfortable for any reason with discussing the incident with his or her supervisor, the employee should report the incident to any of the following individuals: business manager, market manager, regional vice president, Cumulus' Director of Human Resources, or Cumulus' General Counsel. If the employee does not believe that adequate steps are being taken to address his or her complaint at the market level, the employee should immediately call the Director of Human Resources or the General Counsel directly.

(Doc. 43-2 (Dep. Leslie at 38); Doc. 43-2 at 60; Doc. 51-6 at 1-2). The policy provides that Cumulus "will investigate harassment complaints as discreetly and confidentially as possible. No one will be

retaliated against for making a complaint of harassment…" (Doc. 43-2 at 60).

Although she does not recall whether she received copies, on November 16, 2007, Leslie acknowledged receipt and understanding of Cumulus' Policy Prohibiting Unlawful Discrimination, Harassment and Retaliation, the Code of Business Conduct and Ethics, and the Whistleblower Hotline, among other policies, and she received a handbook that discusses sexual harassment and discrimination before starting employment. (Doc. 43-2 (Dep. Leslie at 30-34, 35-37, 41); Doc. 43-2 at 58). Leslie understood that if she felt she was a victim of sexual harassment at the workplace, she had the right to complain. (Id. (Dep. Leslie at 33)).

### D. Leslie's Allegations of Sexual Harassment/Hostile Environment[12]

Leslie allegations of sexual harassment consist of a few isolated comments, and the receipt of one (1) text message of a sexually explicit photograph from co-worker Johnnie Coleman (the "breaking point"). (Doc. 43-2 (Dep. Leslie at 52, 179-185)). Apart from "some of the language that was used in the office[,]" the photograph was the first time that Leslie experienced anything that she considered rising to the level of sexual harassment directed to her at Cumulus. (Id. (Dep. Leslie at 179-180)).

Regarding the comments, in 2007 or 2008, Leslie complained to Sales Manager Janet Armstead ("Armstead") about one comment made by co-worker Ben Gordon ("Gordon"): "[i]t's the weekend. I want you to come back with smiles on your faces[]" or "I want the females in the office to make sure you get some dick over the weekend[]" within earshot of management including McMillen and then-Market Manager Candice Houston. (Id. (Dep. Leslie at 79-81, 86-87)). Leslie complained about Gordon's

---

[12] Leslie alleged additional allegations as part of her sexual harassment claim; however, these allegations lack any sexual content or aspect and instead are simply allegations of unprofessionalism, disrespect and/or rude behavior, which are not supportive of her claim and thus have not been considered on summary judgment (*e.g.*, Leslie's complaint about account billing issues (Doc. 43-2 (Dep. Leslie at 69-70), lack of confidentiality (Id. (Dep. Leslie at 70-71), rude behavior by Bill Fuerst (Id. (Dep. Leslie at 62-63, 188), unprofessional language (Id. (Dep. Leslie at 57-61), overall disrespect at the office (Id. (Dep. Leslie at 65-69, 81, 86), an "overall attitude" towards her by McMillen (Id. (Dep. Leslie at 108-113), being called a "kiss ass" friend of a client by McMillen (Id. (Dep. Leslie at 112, 116-117, 162-164, 180-181), and being called "Wiggie Mae" (Id. (Dep. Leslie at 178-179)).

comment to Houston, who responded "you know how they are" and nothing was done. (Id. (Dep. Leslie at 87)). In December 2008, while Leslie was sharing a sales call ride with Gordon and McMillen, Gordon and/or McMillen used the phrase "busting balls" which made her "very uncomfortable" as she felt it was a sexual comment. (Id. (Dep. Leslie at 53, 60, 79, 186-187)). Leslie had shared car rides with Gordon for "about four years" without reporting any complaints about Gordon. (Doc. 43-2 (Dep. Leslie at 54-55)). However, Leslie alleges other "vulgar sexual comments" (dates unknown) by Gordon including "if you saw a penis you wouldn't know what to do with it" and that he repeatedly called Leslie "gay" because she refused a co-workers' request for a date. (Id. (Dep. Leslie at 222-224)).[13]

Concerning the sexually explicit photograph, on January 12, 2009 at 11:02 a.m., Leslie received a text message on her cellular phone from co-worker Johnnie Coleman, which she opened 2-3 weeks after receipt of same; the message attachment was a photograph of Coleman's erect penis. (Id. (Dep. Leslie at 169-173); Doc. 48 (Sealed)). Coleman had never said, joked, e-mailed or texted anything personal or offensive to Leslie before January 12, 2009. (Id. (Dep. Leslie at 174-177). Coleman's e-mailing of the photograph is the *only* inappropriate thing that Coleman ever did to her. (Id. (Dep. Leslie at 177)). About three (3) days after opening the attachment, Leslie sent her complaint to the corporate office. (Id. (Dep. Leslie at 171)). Leslie testified that neither Denning nor anyone at the corporate level knew about her complaints of what was occurring to her in terms of sexual harassment at Cumulus, until she formally complained to the corporate office. (Id. (Dep. Leslie at 222)).

Specifically, on February 13, 2009, when Leslie was absent from work, Leslie e-mailed her first Formal Complaint of sexual harassment to Cumulus' corporate office in Atlanta, Georgia, c/o the Director of Human Resources Laurie Bouhan ("Bouhan"), requesting an investigation of "[v]arious forms of verbal harassment" and "sexual harassment (explicit documentation)." (Doc. 43-2 (Dep. Leslie at 69-

---

[13] The only "sexual advance" Leslie encountered was being asked out once by co-worker "KJ" and there was nothing else she considered a sexual advance by a male co-worker. (Doc. 43-2 (Dep. Leslie at 65, 223)).

77, 113, 159-161, 164); Doc. 43-2 at 131; Doc. 51-1; Doc. 51-2). Leslie described an "anything goes" environment that was a hostile and unprofessional setting. (Doc. 43-2 (Dep. Leslie at 69-77, 113, 159-161, 164)). Leslie stated that she would provide specific documentation once contacted. (Id.) Leslie also expressed concern about the lack of confidentiality when she submitted the complaint, specifically that it would be discussed within the Cumulus office. (Doc. 43-2 (Dep. Leslie at 165-167)).

In response, Bouhan e-mailed and spoke with Leslie requesting specific information so that Cumulus could investigate. (Doc. 43-2 at 135-140, 145-146; Doc. 43-2 (Dep. Leslie at 162, 181-182; Doc. 43-9 (e-mails))). Subsequently, Leslie e-mailed Bouhan a photograph of an erect penis and a four (4) page memo detailing 11 specific concerns, the first nine (9) of which focused on account handling/confidentiality concerns at Cumulus, not sexual harassment. (Doc. 43-2 (Dep. Leslie at 182-183, 187); Doc. 43-2 at 134, 141, 147-150; Doc. 51-3). Leslie's "Concern #10" was for "inappropriate language" on a daily basis (which she discussed with management), citing the December 2008 incident of Gordon and McMillen having a "discussion [which] consisted of sexual comments[]" (the "busting balls" comment). (Doc. 43-2 (Dep. Leslie at 34, 183, 186)). Leslie also cited Market Manager Gary Pizzati's apology to her for a sexual comment made by a sales representative. (Id.) Leslie's "Concern #11" was regarding the photograph from Coleman. (Id. (Dep. Leslie at 179-180)).

On February 17, 2009 Bouhan responded via e-mail stating "Daphne, This type of photo is TOTALLY unacceptable! This violates Cumulus policy and we need to know who sent this to you." (Doc. 43-2 (Dep. Leslie at 175); Doc. 43-2 at 142). At that time, Leslie had not identified who sent the photograph or when it was received, but upon request, submitted her cell phone statement showing the picture was received by text message on January 12, 2009 from a local number. (Doc. 43-2 (Dep. Leslie at 169-171)). On February 18, 2009, Leslie identified the sender as co-worker Johnnie Coleman. (Doc. 43-2 (Dep. Leslie at 162-164); Doc. 43-2 at 144). That same day, Bouhan reported Leslie's complaint to Cumulus' General Counsel, Richard Denning ("Denning"), and Denning commenced an investigation including calling and e-mailing Leslie. (Doc. 43-3 (Dep. Denning at 126-133, 162-167); Doc. 43-2 (Dep.

Leslie at 187-190); Doc. 43-2 at 132-133, 151; Doc . 43-3 at 19). Denning and Bouhan agreed that the photo was offensive and against Cumulus' policy. (Doc. 43-2 Dep. Leslie at 187)).

On March 2, 2009, Denning telephoned Coleman to ask him about the photograph. (Doc. 43-3 (Dep. Denning at 104-105, 164); Doc. 43-3 at 19). After Coleman admitted sending the photograph, Denning told him it "was very inappropriate" and he was going to be terminated. (Doc. 43-3 (Dep. Denning at 164-167); Doc. 43-3 at 19). Coleman elected instead to resign. (Id.) That same day Denning wrote Leslie detailing Cumulus' investigation of her complaints. (Doc. 43-2 (Dep. Leslie at 192); Doc. 43-2 at 151-156; Doc. 60-1 at 19-22). Denning confirmed that Coleman sent Leslie the inappropriate photo[14] and notified her that Coleman was no longer employed. (Doc. 43-2 at 154; Doc. 43-3 (Dep. Denning at 128-131, 162-167)). Leslie did not respond. (Doc. 43-2 (Dep. Leslie at 188)).

Also on March 2, 2009, Leslie completed an Intake Questionnaire with the EEOC. (Doc. 62-1). In this questionnaire, Leslie noted that she did not have a disability (Id. at 1), and that the basis for her claim of employment discrimination was sexual harassment and verbal harassment (Id. at 2). She specified receipt of a sexually explicit photograph by a co-worker in January 2009, and "various verbal abuse and overall harassment via management[]" in December 2009. (Id. at 2). On March 4, 2009, Leslie filed an EEOC Charge against Cumulus alleging sex discrimination by Coleman and "other instances of sexual harassment and offensive language" occurring from February 1, 2009-March 2, 2009. (Doc. 43-2 (Dep. Leslie at 206-208); Doc. 43-2 at 175).

On March 24, 2009, Leslie faxed a memorandum to Bouhan "to request additional assistance concerning possible retaliation incidents." (Doc. 43-2 (Dep. Leslie at 192-193, 195); Doc. 43-2 at 157-158, 165). At that time, her primary concern was the March 23rd work performance memo. (Doc. 43-2 (Dep. Leslie at 192-193, 198); Doc. 51-9 (3/24/09 Memo)). Leslie stated that after filing her EEOC

---

[14] According to Coleman, he did not intentionally e-mail the photograph to Leslie; it was intended for his wife whose name was a line up from Leslie's in his cellular phone directory as "Wifey" and "Wiggy" (Leslie's nickname at work). (Doc. 43-10 (Dep. Coleman at 57-61, 70, 91-92)).

Charge, Cumulus retaliated against her by subjecting her work performance to high scrutiny and issuing

her a performance memo.   (Doc. 43-2 (Dep. Leslie at 193)).   Specifically, according to Leslie, after she

made her complaint in February 2009, McMillen let Leslie know that he knew who filed the complaint

and that "a lot of the areas were being investigated[]" and made "smart remarks" such as touching one of

the male sales representatives on the should and making the comment "I better not touch anyone; I may

get a complaint filed on me." (Id. (Dep. Leslie at 190-191)).[15]   In response, Bouhan e-mailed Leslie (cc'd

Denning) notifying her that Cumulus does not condone retaliation, all complaints are taken seriously and

addressed, and job performance and essential elements of the job are the same for all Cumulus account

executives.  (Doc. 43-2 at 165).

On June 1, 2009, while absent from the office, Leslie requested a telephone conference and spoke

with Bouhan detailing "unnecessary/unprofessional and disrespectful incidents" since she filed her EEOC

Charge, which was communicated to Denning.  (Doc. 43-2 (Dep. Leslie at 196); Doc. 43-2 at 166-167,

171-174).   Leslie reported that she was bothered that: 1) several of her accounts were not serviced while

she was on FMLA leave in May; 2) her Manager arrived 20 minutes late for a client appointment; and 3)

McMillen told her to get her personal laptop computer fixed rather than use the "community computer."

(Doc. 43-2 (Dep. Leslie at 196-197)).   At this time, Leslie had not actually been present at work but she

felt that McMillen retaliated against her due to the issue with the computer and turning his back to her

when talking with the sales team. (Id. (Dep. Leslie at 198-199)).   Denning investigated Leslie's

complaints, responding to each concern in detail on June 2, 2009 and suggesting a call that afternoon.

(Doc. 43-2 (Dep. Leslie at 219); Doc. 43-2 at 171-172).

On September 4, 2009, Leslie filed an Amended EEOC Charge for sex discrimination, retaliation

and disability discrimination alleging that since filing her charge, she had been subjected to "almost daily

---

[15] McMillen disputes that this occurred .  (Doc. 43-12 (Aff. McMillen at ¶4)).

retaliation" and that she was terminated by Cumulus while "absent on temporary disability." (Doc. 43-2 (Dep. Leslie at 213); (Doc. 43-2 at 176). Cumulus does not have "disability leave" separate from permissible FMLA leave and Leslie's participation in the short-term disability program was a matter between Leslie and the carrier. (Doc. 43-3 (Dep. Denning at 189-197)).

## II.    **MOTIONS TO STRIKE**

Plaintiff moves to strike the entirety of the Affidavit of Monte Saunders (Doc. 43-4), and the Cumulus defendants move to strike portions of Leslie's Declaration (Doc. 52-1). At the outset, the motions to strike are construed as Rule 56(c)(2) Objections.[16]

Plaintiff's objections to the Monte Saunders' Affidavit are **MOOT** as the Court has not relied on this affidavit for this summary judgment.

As to the Cumulus' objections to portions of Leslie's Declaration, the objections are **OVERRULED** except as follows:

Cumulus' objections to paragraph 4 are **sustained**. Regarding Paragraph 6 of Leslie's Declaration, Leslie now contends that Coleman forwarded to her and to other employees, a cartoon picture of a penis via text to their cellular phones and that afterwards, Coleman told Leslie "[a]fter you have seen what I sent you, then maybe you will want a man." This allegation has not been considered on summary judgment because it contradicts Leslie's deposition testimony in which she stated that the only sexual harassment she encountered with Coleman was the receipt of one (1) text message photograph to

---

[16] With the December 1, 2010 rules change, it no longer appears that motions to strike exhibits submitted on summary judgment are appropriate. Revised Rule 56(c)(2) provides instead, that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." FED.R.CIV.P. 56(c)(2). The Advisory Committee Notes specify further as follows: "Subdivision (c)(2) provides that a party may object that material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. The objection functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated. *There is no need to make a separate motion to strike*. If the case goes to trial, failure to challenge admissibility at the summary-judgment stage does not forfeit the right to challenge admissibility at trial." FED.R.CIV.P. Adv.Comm.Notes (2010 Amendments (emphasis added)).

her cellular telephone (Doc. 43-2 (Dep. Leslie at 177). Accordingly, the Cumulus defendants' Objections to same are **SUSTAINED.** However, as to Leslie being called "gay," this does not contradict previous testimony thus the Cumulus defendants' objection to such is **OVERRULED.**

## III.   MOTIONS FOR SUMMARY JUDGMENT

### A.   Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (Dec. 2010). The recently amended Rule 56(c) governs Procedures, and provides as follows:

> *(1) Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> *(2) Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> *(3) Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.
>
> *(4) Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

FED.R.CIV.P. Rule 56(c) (Dec. 2010). Defendant, as the party seeking summary judgment, bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). (quoting Celotex Corp. v. Catrett, 477

U.S. 317, 323 (1986)). If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment. <u>Celotex</u>, 477 U.S. at 323. "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." <u>Tipton v. Bergrohr GMBH-Siegen</u>, 965 F.2d 994, 998-999 (11th Cir. 1992), <u>cert. den.</u>, 507 U.S. 911 (1993) (internal citations and quotations omitted).

      **B.**      **<u>Title VII-Hostile Work Environment (Sexual Harassment): Count I</u>**

Title VII of the Civil Rights Act prohibits employers from discriminating in the workplace on the basis of an individual's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e *et seq*. In this case, Leslie alleges sexual harassment/hostile work environment.

To establish a prima facie case of Title VII hostile work environment and/or sexual harassment Leslie must show: 1) she belongs to a protected group; 2) she has been subjected to unwelcome sexual harassment such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; 3) the harassment was based on a protected characteristic (*i.e.*, sex) of the employee; 4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and 5) the employer is responsible for such environment under a theory of vicarious or direct liability. <u>See</u>, <u>e.g.</u>, <u>Mendoza v. Borden, Inc</u>., 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc) (citation omitted). <u>See also</u> <u>e.g.</u>, <u>Reeves v. DSI Sec. Servs., Inc</u>., 395 Fed. Appx. 544, 545-546 (11th Cir. 2010); <u>McCann v. Tillman</u>, 526 F.3d 1370, 1378 (11th Cir. 2008); <u>Miller v. Kenworth of Dothan, Inc</u>., 277 F.3d 1269, 1275 (11th Cir. 2002). "Workplace conduct is not measured in isolation." <u>Clark County Sch. Dist. v. Breeden</u>, 532 U.S. 268, 270 (2001) (per curiam). Evidence of harassment is considered cumulatively --in the totality of the circumstances. <u>Mendoza</u>, 195 F.3d at 1242.

Assuming the existence of the first three elements -- as the Court views the facts in the light most favorable to plaintiff on summary judgment -- the Court turns to element four. As to whether the conduct

was severe and pervasive, Leslie relies upon her complaints concerning a few sporadic and isolated remarks,[17] apart from the one (1) e-mail photograph she received from Coleman. Leslie does not allege that she was ever touched, kissed or propositioned for sex by any employee at Cumulus. Apart from the single e-mail photograph from Coleman, Leslie's sexual harassment allegations are, at best, unprofessional and/or "sex talk." See, e.g., Beasley v. Wal-Mart Stores East, L.P., 2006 WL 3449144, at *8-9 (S.D. Ala. Nov. 29, 2006) (granting summary judgment where comments were "at best mere sex talk, which without more, does not rise to the level of objectively severe and pervasive harassment").

To be actionable as severe or pervasive, the harassment "must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceive[s]…to be abusive." Miller, 277 F.3d at 1276 (internal citation and quotation marks omitted). In other words, the severe or pervasive element has an objective and subjective component. McCann, 526 F.3d at 1378. The court will assume that there is sufficient evidence, if believed by a jury, that Leslie subjectively perceived her work environment to be sexually hostile.

The Court turns to whether Leslie's perception was objectively reasonable. In so determining, Eleventh Circuit precedent mandates that courts consider "the totality of the circumstances." See, e.g., Miller, 277 F.3d at 1277. To determine the objective severity, courts consider: 1) the frequency of the discriminatory conduct; 2) the severity of the conduct; 3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and 4) whether the conduct unreasonably interferes with an employee's job performance. Reeves, 395 Fed. Appx. at 546. See also Faragher v. City of Boca Raton, 524 U.S. 775, 787-788 (1998); Allen v. Tyson Foods, 121 F.3d 642, 647 (11th Cir. 1997) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)). "The conduct is considered cumulatively instead of in isolation." Reeves, 395 Fed. Appx. at 546.

---

[17] As noted *supra* Section I, the majority of Leslie's complaints concern unprofessionalism and disrespect and are not sexual in nature and thus, merit no further discussion.

In this case, Leslie has not submitted sufficient evidence from which a reasonable jury could find that the alleged sexual harassment was frequent, severe, physically threatening, humiliating, demeaning and/or unreasonably interfered with her job.  A few isolated offhand or offensive comments do not constitute actionable sexual harassment.  Additionally, one (1) instance of a co-worker sending a sexually explicit e-mail photograph does not arise to "severe or pervasive." <u>See</u>, <u>e.g.</u>, <u>McCann v. Tillman</u>, 526 F.3d 1370, 1379 (11th Cir. 2008) (noting that "sporadic and isolated" conduct even if offensive, is not enough). It is repeated incidents of...harassment that continue despite the employee's objections [that] are indicative of a hostile work environment." <u>Miller</u>, 277 F.3d at 1276 (citation and quotation omitted).  "'[S]imple teasing,'...offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" <u>Faragher,</u> 524 U.S. at 788 (citations omitted).  "These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.' Properly applied, they will filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.' We have made it clear that conduct must be extreme[.]" <u>Id</u>.  <u>See</u> <u>also</u> <u>e.g.</u>, <u>Indest v. Freeman Decorating, Inc.</u>, 164 F.3d 258, 264 (5th Cir. 1999)  (providing that "[a]ll of the sexual hostile environment cases decided by the Supreme Court have involved patterns or allegations of extensive, long lasting, unredressed, and uninhibited sexual threats or conduct that permeated the plaintiffs' work environment[]").  In sum, "'Title VII...does not operate as a general ban on...rude or offensive behavior.'" <u>Weaver v. Potter,</u> Slip Copy, 2010 WL 2465423, at *4 (S.D. Ga. Apr. 21, 2010) (citation omitted).

Under the totality of the circumstances and considering the allegations in the light most favorable to Leslie, she has not produced sufficient evidence – if believed by a jury – to create an issue of fact as to whether she was subjected to sexual harassment that was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment. As a result, because Leslie has failed to satisfy this fourth element of her prima facie case for hostile work

environment, the Court need not reach the fifth element (employer liability) and summary judgment is **GRANTED** in favor of the Cumulus defendants on this claim.

### C.    FMLA Retaliation: Count II

Leslie asserts a claim against the Cumulus defendants for retaliation brought pursuant to the *Family Medical Leave Act of 1993*, 29 U.S.C. § 2601, *et seq.* ("FMLA"). (Doc. 1 at 7-8). The FMLA grants an eligible employee the right to take up to 12 workweeks of unpaid leave during any 12 month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). To be "eligible" for FMLA leave, the employee must be employed: "(i) for at least 12 months by the employer with respect to whom leave is requested under section 2612 of this title; and (2) for at least 1,250 hours of service with such employer during the previous 12-month period." 29 U.S.C. § 2611(2)(A). "The Act creates a private right of action to seek equitable relief and money damages against employers who 'interfere with, restrain, or deny the exercise of or the attempt to exercise' FMLA rights." Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1293 (11th Cir. 2006). Additionally, the FMLA creates two types of claims: interference claims (in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, see 29 U.S.C. § 2615(a)(1)), and retaliation claims (in which an employee asserts that his employer discriminated because he engaged in activity protected by the Act, 29 U.S.C. § 2615(a)(1)-(2) and 29 C.F.R. § 825.220(c)). Leslie alleges FMLA retaliation. As noted in Strickland v. Water Works and Sewer Bd. of City of B'ham, 239 F.3d 1199, 1206-1207 (11th Cir. 2001): "[t]o succeed on a retaliation claim, an employee must demonstrate that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right…a plaintiff…faces the increased burden of showing that his employer's actions 'were motivated by an impermissible retaliatory or discriminatory animus.'"

Leslie does not contend that there is direct evidence of retaliation but instead addresses her FMLA retaliation claim in the context of the burden-shifting framework established in McDonnell

Douglas Corp. v. Green, 411 U.S. 792 (1973). Under this framework, Leslie bears the initial burden of establishing a prima facie case of discrimination, *i.e.*, retaliation, by a preponderance of the evidence and if she does so, a presumption of discrimination arises. See, e.g., Christian v. Cartersville City Schools Bd. of Educ., 167 Fed Appx. 89, 91 (11th Cir. 2006); Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981). "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997). In order to establish a prima facie case of retaliation, Leslie must show the following: 1) she engaged in statutorily protected activity; 2) she experienced an adverse employment action; and 3) a causal connection between the protected activity and the adverse action. Hurlbert, 439 F.3d at 1297. Once the employee establishes a prima facie case, the burden shifts to the employer "to articulate a legitimate reason for the adverse action." Id. If the employer does so, the employee must then show that the employer's proffered reason was pretextual by presenting evidence "sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." Id. at 1298 (internal quotation marks omitted). In so doing, the employee may rely on evidence that she already produced. See, e.g., Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997); Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 921 (11th Cir. 1993). See also e.g., Martin v. Brevard County Public Schools, 543 F.3d 1261, 1268 (11th Cir. 2008).

Leslie contends that Cumulus retaliated against her for taking FMLA leave by terminating her on August 20, 2009. (Doc. 1 at ¶¶31-35). The Cumulus defendants contend that Leslie never returned or attempted to return to work upon the expiration of her FMLA leave, or for several weeks thereafter.

The Court finds that Leslie has failed to provide sufficient evidence to establish a prima facie case of FMLA retaliation. As a threshold matter, Leslie must establish that she engaged in statutorily protected activity. Leslie's statutorily protected conduct was her use of 12 weeks of FMLA leave during 2009 for her serious medical condition of severe depression. As her FMLA leave expired on August 7, 2009, Leslie's absence beyond that date was not statutorily protected conduct. Specifically, Leslie's

FMLA leave absences (12 weeks or 84 days) consist of the following: May 4-May 19, 2009 (16 days); June 1-June 30, 2009 (30 days); July 1-July 31, 2009 (31 days); and August 1-7, 2009 (7 days).  See supra Section I.  Cumulus gave Leslie her a full 12 weeks of FMLA leave, *plus 13 extra days*, but Leslie failed to return to work.  While Leslie contends, in conclusory fashion, that she had FMLA leave remaining such that her leave did not expire on August 7, 2009, she has failed to present sufficient evidence in support of her contention, choosing instead to essentially ignore the record evidence which confirms that she had already taken a number of days of FMLA leave prior to her June 3, 2009 request.

A plaintiff is entitled to FMLA leave for 12 workweeks during any 12-month period because of a serious health condition that makes that employee unable to perform the functions of her position.  29 U.S.C. § 2612.  However, "taking more leave than is allowed by the FMLA is not protected conduct." See, e.g., Johnson v. Morehouse College, Inc., 199 F. Supp. 2d 1345, 1362 (N.D. Ga. 2002).  "[A]s long as the employee has been given the requisite leave period under the FMLA, the FMLA does not forbid an employer from firing an employee who simply refuses to come back to work[,]" and thus, an employer is not liable under the FMLA for firing an employee who does not return to work after her FMLA leave has expired.  Id. at 1360-1361.  See also e.g., McGregor v. Autozone, Inc., 180 F.3d 1305, 1308 (11th Cir. 1999); Bender v. City of Clearwater, 2006 WL 1046944, *12 (M.D. Fla. Apr. 19, 2006).  As noted in Carter v. Dialysis Clinic, Inc., 2008 WL 4722070,*6 (M.D. Ala. Oct. 22, 2008): "an employer does not violate the FMLA when it fires an employee who is indisputably unable to return to work at the conclusion of the 12-week period of statutory leave." (citations omitted).  Moreover, "[a]n employee's insistence on taking more leave than is allowed by the FMLA is not protected conduct."  Bender, 2006 WL 1046944, *12.  In other words, Leslie has not established that her termination was motivated by anything other than by her continued unauthorized absence from work *after* her FMLA leave expired.

In sum, Leslie's FMLA retaliatory termination claim fails because she has not established that she was engaged in a FMLA protected activity at the time of her August 20, 2009 termination by Cumulus. Given Leslie's failure to establish the first requisite element of  her prima facie case, the Court need not

24

address the remaining elements.[18]  Thus, it is **ORDERED** that the Cumulus Defendants' motion for summary judgment as to Leslie's FMLA retaliation claim (Count II) is **GRANTED.**

### D.    ADA- Wrongful Termination: Count III

In Count III of the Amended Complaint, Leslie alleges a claim for wrongful termination in violation of the *American with Disabilities Act of 1990,* 42 U.S.C. § 12101 *et seq.* ("ADA").  Specifically, Leslie contends that she is a qualified individual with a disability; Cumulus perceived her as disabled and had a record of her disability; Cumulus terminated her while she was out on medical leave due to her disability in violation of the ADA; and upon receiving notice from her physician that she was suffering from severe depression, terminated her employment.  (Doc. 24 at 9).

The ADA mandates that no covered employer shall discriminate against "a qualified individual with a disability because of the disability of such individual" in any of the "terms, conditions [or] privileges of employment." 42 U.S.C. § 12112(a). Employers have the duty to provide reasonable accommodations for known disabilities unless doing so would result in undue hardship to the employer. Morisky v. Broward County, 80 F.3d 445, 447 (11th Cir. 1996). To establish a prima facie case of discrimination in violation of the ADA, Leslie must prove that: 1) she has a disability; 2) she is a qualified individual; and 3) she was subjected to unlawful discrimination because of her disability. Id. See also Durley v. APAC, Inc., 236 F.3d 651, 657 (11th Cir. 2000); Witter v. Delta Air Lines, Inc., 138 F.3d 1366, 1369 (11th Cir. 1998).

First, "[i]n order to state a claim for wrongful termination under the ADA, a plaintiff must first prove that he has a disability, as defined by the Act." Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318,

---

[18] Nevertheless, the Court also notes that an employer may require that an employee present a fitness for duty certificate before returning to work, 29 U.S.C. § 2614, and unless the employee does so, she "may be terminated." 29 C.F.R. § 825.313. See, e.g., Burkett v. Beaulieu of America, Inc., 168 Fed. Appx. 895, 896 (11th Cir. 2006); Barnes v. Ethan Allen, Inc., 356 F. Supp. 2d 1306, 1311 (S.D. Fla. 2005).  The record reveals that despite requests by Cumulus for information concerning Leslie's medical status, her ability to return to work (and if needed, what accommodations would be required), a fitness for duty report, her ability to perform her essential job functions, and a date that she would actually return to work, Leslie did not provide the requested information.

1327 (11th Cir. 1998).  Disability is defined in three ways as "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such impairment; or (3) being regarded as having such an impairment[]." 42 U.S.C. § 12102(2).  "Merely proving the existence of a physical or mental impairment, without addressing any limitation on major life activities, is not sufficient to prove disability under the Act."  Standard, 161 F.3d at 1327.  Here, Leslie's alleged disability is severe depression.  Depression is a mental impairment.  Pritchard v. Southern Co. Servs., 92 F.3d 1130, 1132 (11th Cir. 1996).[19]  Cumulus contends, in part, that even if Leslie can prove she was disabled, she is not a qualified individual.  (Doc. 44 at 26).

A "qualified individual with a disability" is an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).  Thus to be a "qualified individual" Leslie must, at the relevant time, be able to "perform the essential functions of the job in question with or without reasonable accommodations[.]"  See, e.g., Boone v. Rumsfeld, 172 Fed. Appx. 268, 271 (11th Cir. 2006) (unpublished); Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1255 (11th Cir. 2001).  "The ADA provides that consideration shall be given to the employer's judgment as to what functions of a job are essential and the employer's written description for that job."  See, e.g., Davis v. Florida Power & Light Co., 205 F.3d 1301, 1305 (11th Cir. 2000). The Eleventh Circuit has held that in addition to possessing the required skills necessary to perform the essential job functions, an employee must be able to demonstrate those skills by reporting to work on a regular basis, thereby making attendance an essential function of most jobs. Jackson v. Veterans Admin., 22 F.3d 277 (11th Cir. 1994).

Cumulus asserts that Leslie is not a "qualified individual" because she cannot perform an essential function of her job – regular attendance – much less other functions "such as interacting with

---

[19] As noted in Pritchard, 92 F.3d at 1132: "Depression has been held to constitute a mental impairment. *See, e. g., Doe v. Region 13 Mental Health-Mental Retardation Commission*, 704 F.2d 1402, 1408 (5th Cir.1983)."

people as a salesperson must." (Doc. 44 at 27). Leslie sought an indefinite leave of absence to accommodate her alleged disability of severe depression. If a disabled employee requires an accommodation to perform the essential functions of her job, she must make "a specific demand for an accommodation" and must prove that the proposed accommodation is reasonable. See, e.g., Gaston v. Bellingrath Gardens & Home, Inc., 167 F.3d 1361, 1363-1364 (11th Cir. 1999). Leslie has not established that she was able to "perform the essential functions of the job in question with or without reasonable accommodations" or that she even made any demand (much less a specific demand) for an accommodation which was reasonable. Specifically, as detailed *supra*, Leslie did not provide the requested information to Cumulus concerning a return to work date and/or her ability to perform her essential job functions. Moreover, while Leslie alleges in her Complaint that she requested "reasonable accommodation in the form of short-term disability leave" (Doc. 1 at ¶39) and received short-term disability, there is no evidence that she requested any reasonable accommodation from Cumulus. Leslie's request to Cumulus for a leave of absence so that she could return to work at some uncertain point in the future was an unreasonable accommodation. See Wood v. Green, 323 F.3d 1309, 1313-1314 (11th Cir. 2003) (providing that "[t]he ADA covers people who can perform the essential functions of their jobs presently or in the immediate future[]"). Accordingly, Leslie was not a "qualified individual" under the ADA. As such, the Cumulus Defendants' motion for summary judgment as to Leslie's ADA claim for wrongful termination (Count III) is **GRANTED.**

E.      **State Law Claim against Cumulus**

Leslie contends that Cumulus negligently hired, trained and/or supervised its former Cumulus employee Johnnie Coleman. In the context of a sexual harassment claim, "[t]o recover on negligent supervision and training claims against an employer, '[a] plaintiff must establish 'by affirmative proof' that the employer actually knew of the incompetence [of the employee], or that the employer reasonably should have known of it. *Southland Bank v. A & A Drywall Supply Co.*, 21

So.3d 1196, 1215-16 (Ala. 2008) (citation omitted) (explaining that claims for negligent supervision and training are treated as one claim subject to the same standard)...The plaintiff meets this burden by either showing 'specific acts of incompetency and bringing them home to the knowledge of the master, or by showing them to be of such nature, character, and frequency that the master, in the exercise of due care, must have had them brought to his notice.' *Lane v. Cent. Bank of Ala., N.A.,* 425 So.2d 1098, 1100 (Ala.1983) (citation omitted)." Speigner v. Shoal Creek Drummond Mine, 402 Fed. Appx. 428, 433 (11th Cir. 2010) (unpublished). Moreover, one instance of misconduct is insufficient to establish liability against the employer under a negligent supervision/training claim. Southland Bank, 21 So.3d at 1216. Thus even assuming that Leslie could establish her claim against Coleman, her claim against Cumulus fails. Leslie has submitted no evidence of previous complaints of sexual harassment involving Coleman, whether with her or any other employee at Cumulus. Nor is there any evidence of previous problems of this nature in Coleman's work history such that Leslie's claim of negligent hiring is also unsupported by evidence.

Accordingly, the Cumulus Defendants' motion for summary judgment as to Leslie's state law claim for negligent hiring, training and/or supervision (Count IV) is **GRANTED** and Leslie's motion for summary judgment on this same claim is **DENIED.**

### F. State Law Claims against Coleman

Leslie contends that Defendant Coleman's act of e-mailing one photograph of his penis to her cellular telephone constitutes invasion of privacy and intentional infliction of emotional distress.

A court's exercise of supplemental jurisdiction over remaining state law claims is discretionary. Under 28 U.S.C. § 1367(c)(3), the court may "decline to exercise supplemental jurisdiction over a [state law] claim if the district court has dismissed all claims over which it has original jurisdiction...." This Court's discretion is advised by United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966), in which the Court held that "[n]eedless decisions of state law should be avoided both as a matter of comity

and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. [ ] Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." Id. at 726. Likewise, in Carnegie–Mellon Univ. v. Cohill, 484 U.S. 343 (1988), the Supreme Court reiterated that "when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice..." The Eleventh Circuit has further explained that "if the federal claims are dismissed prior to trial, *Gibbs* strongly encourages or even requires dismissal of state claims." Mergens v. Dreyfoos, 166 F.3d 1114, 1119 (11th Cir. 1999), cert. den., 528 U.S. 820 (1999). See also e.g., Arnold v. Tuskegee University, 212 Fed. Appx. 803, 811 (11th Cir. 2006) (unpublished) (providing that "[w]hen the district court has dismissed all federal claims from a case, there is a strong argument for declining to exercise supplemental jurisdiction over the remaining state law claims"); Rowe v. City of Ft. Lauderdale, 279 F.3d 1271, 1288 (11th Cir. 2002) (finding that "[b]oth comity and economy are served when issues of state law are resolved by state courts[]"). Moreover, a federal district court may exercise subject matter jurisdiction over a civil action in which only state law claims are alleged if the civil action arises under the federal court's diversity jurisdiction. 28 U.S.C. § 1332(a)(1). The diversity statute confers jurisdiction on the federal courts in civil actions "between citizens of different states," in which the jurisdictional amount is met. Id.

The Complaint (and Answers thereto) indicates that Plaintiff Leslie is a resident of Mobile County, Alabama and a citizen of the State of Alabama, but provides no state citizenship information for Defendant Coleman. (Doc. 1 at 2-3; Doc. 9; Doc. 23 at 2).[20] Thus, the Court cannot determine whether there exists a basis for diversity jurisdiction. 28 U.S.C. § 1332. Moreover, the Complaint does not allege diversity of citizenship as a basis for jurisdiction in this Court. (Doc. 1 at 1 at ¶1). As such, there are no

---

[20] According to Cumulus, Defendant Cumulus Media, Inc., did not employ Leslie and thus is not a proper party to this action. (Doc. 9 at 2 at ¶5).

facts alleged by Leslie to support diversity jurisdiction in this case. Accordingly, the Court declines to exercise supplemental jurisdiction over the remaining state law claims.

**IV.**     <u>**Conclusion**</u>

Accordingly, it is **ORDERED** that Leslie's Objections (Doc. 54) are **MOOT** and the Cumulus Defendants' Objections (Doc. 60) are **SUSTAINED in part** and **OVERRULED in part** as detailed *supra*. Additionally, it is **ORDERED** that Cumulus Defendants' motion for summary judgment (Doc. 43) is **GRANTED** as to Leslie's Title VII sexual harassment/hostile work environment claim, FMLA retaliation claim and ADA wrongful termination claim, as well as to Leslie's negligent hiring, training and/or supervision claim. As such, Leslie's motion for summary judgment (Doc. 39) regarding her negligent hiring, training and/or supervision claim against the Cumulus' defendants is **DENIED.** Moreover, as detailed *supra*, Leslie's claims for invasion of privacy and intentional infliction of emotional distress against Coleman are **DISMISSED without prejudice** such that Leslie's motion for summary judgment (Doc. 39) on said claims is **MOOT.**

**DONE** and **ORDERED** this the **30**[th] day of **August 2011.**

<u>/s/ Kristi K. DuBose</u>
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**